In re DIVERSIFIED INDUSTRIES, INC.
a/d/b/a Plume & Atwood Brass Mill
Division, Debtor.

Diversified Industries, Inc., Movant.

Bankruptcy No. 93–41173–293.
Motion No. 270.

United States Bankruptcy Court,
E.D. Missouri, E.D.

Nov. 19, 1993.

Robert H. Skilton, Chicago, IL, David A. Sosne, St. Louis, MO, and Melanie Nussdorf, Sp. Counsel, Steptoe and Johnson, Washington, DC, for debtor.

Richard S. Beldner, Gen. Counsel, Diversified Industries, Inc., Clayton, MO.

Barbara J. Houser, Dallas, TX, for creditors committee.

Robert H. Brownlee, St. Louis, MO, for Ben Fixman.

David L. Going, St. Louis, MO, for Dracma Corp., Kenin Spivak, and Michael Pochna.

Stanley Hecht, Pension Benefit Guar. Corp., Washington, DC, for PBGC.

Leonora S. Long, St. Louis, MO, for Office of U.S. Trustee.

## MEMORANDUM OPINION

DAVID P. McDONALD, Bankruptcy Judge.

### JURISDICTION

This Court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334, 151, and 157 and Local Rule 29 of the United States District Court for the Eastern District of Missouri. This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(A), which the Court may hear and determine.

### PROCEDURAL BACKGROUND

On August 4, 1993, the Debtor filed its Motion For Authorization To Terminate Diversified Industries, Inc. Retirement Income Plan, wherein it alleged:

"5. Debtor believes that it is in its best interest that it seek the termination of the Diversified Plan because unless the Plan is terminated, Debtor and its subsidiaries will be unable to pay their debts when due and Debtor will be unable to continue in business outside the Chapter 11 reorganization process. Debtor further believes that there is no creditor support for funding the Diversified Plan on an ongoing basis in any plan of reorganization."

The Debtor sought an entry of an order authorizing it to submit appropriate documentation to the Pension Benefit Guaranty Corporation (PBGC) to terminate the Diversified Industries, Inc. Retirement Income Plan (the Diversified Plan). Notice of Hearing was sent to all parties of interest, which set a time for filing written objections or exceptions to the relief sought. On August 9, 1993 Ben Fixman filed Preliminary Objections of Ben Fixman To Debtor's Motion For Authorization To Terminate The Diversified Industries, Inc. Retirement Income Plan. Thereafter Mr. Fixman filed supplemental objections on August 13, 1993.

### FACTUAL BACKGROUND

On March 4, 1993, the Debtor filed its voluntary petition under the provisions of Chapter 11 of the United States Bankruptcy Code. The Debtor's principal assets consist of a Connecticut brass mill operated by its Plume & Atwood Division (Plume & Atwood) and its interest in a wholly-owned subsidiary known as United Refining & Smelting Co. ("United"). The Debtor's plan of reorganization calls for the liquidation of Plume & Atwood's assets and the continuation of United's operation, which is not in Bankruptcy.

As of March 4, 1993 the Debtor maintained five separate defined retirement benefit plans subject to Title IV of ERISA, including the Diversified Plan. All of the Debtor's plans are under-funded. The total unpaid minimum contributions for all of these plans as of December 31, 1992 were $2,841,000 of which the minimum contribution due for the Plan was $501,000. Darrell Steckland, Debtor's Vice President of Finance,[1] described in

---

1. Mr. Steckland has a Bachelor of Science degree from Southern Illinois University, worked for Arthur Anderson & Company in St. Louis for twelve years and is a CPA. He is responsible for the overall financial management of Diversified.

detail how he determined the extent of the unfunded liability connected with the pension plans, which is reflected in the company's Analysis Of Pension Accrual & Contribution Requirements. He estimated that, assuming a 7% discount rate, the total under-funding for all of the Debtor's plans as of October 31, 1992 was $9,283,679 for which the Diversified Plan, in which Mr. Fixman is a participant, represented an under-funding of $2,761,897. He also explained that as the discount rate decreases the liability increases and as of the date of the hearing he testified that the discount rate was less than the 7% discount rate.

The required minimum contributions for the Diversified Plan were estimated at $710,-000 for 1993, $403,000 to $587,000 for 1994, $155,000 to $489,000 for 1995, from zero to $462,000 for 1996 and from zero to $44,000 for 1997. These minimum contribution estimates were estimated based upon the assumption that the Internal Revenue Service would grant a waiver for the 1992 plan year. If the IRS granted waivers of the minimum funding obligations for the years 1993 and 1994 there still would be substantial minimum funding payments owing for each of those years. The company's total funding obligation for those years could range from $962,000 to $2,534,000 depending on the performance of the Plan's investment.[2]

The Debtor gave notice of its intent to seek termination of all pension plans. Mr. Fixman was the only individual who filed an objection. Since there was no objection to the termination of four of these plans, this Court granted authorization and the Debtor has initiated the process with PBGC to terminate those four. The Debtor believes that the benefits for all the participants in these four plans are fully guaranteed by PBGC.

The primary difference between the remaining plan and the other four plans is that this last plan provides Mr. Fixman and certain other present and former members of the Debtor's senior management team substantial pension benefits, a large portion of these are not guaranteed by the PBGC. The

parties generally agree that if the senior management pension plans are terminated, Mr. Fixman will lose a greater sum than any other employee. Mr. Fixman's pension plan provides him with an annual payment of approximately $136,000. If his plan is terminated, his annual pension will drop to approximately $27,000, the maximum payment that PBGC insures.

The Court further finds that the Debtor has elected to seek authorization from the PBGC to terminate the Diversified Plan pursuant to ERISA's distress termination procedure. The Debtor, in the reasonable exercise of its business judgment, has determined that it is in the best interests of itself and its creditors to seek approval from the PBGC to terminate the Plan as:

(1) the Debtor does not believe that it can formulate a reorganization plan based upon the continuation of the Plan; and

(2) it would not have the ability to successfully continue the operations of its United Refining & Smelting Co. subsidiary if it did not terminate the Diversified Plan.

### DISCUSSION

■ The parties agree that ERISA governs the termination of pension plans. The exclusive means of plan termination is set forth in 29 U.S.C. § 1341(a)(1):

"Except in the case of a termination for which proceedings are otherwise instituted by the corporation [PBGC] as provided in section 1342 of this title, a single employer plan may be terminated only in a standard termination under subsection (b) of this section or a distress termination under subsection (c) of this section."

Since the Plan is not solvent, the only method of termination is by means of a distress termination pursuant to 29 U.S.C. § 1341(c), which requires the plan administrator to provide 60 days advance notice of intent to terminate the affected parties; submit to PBGC various information as required by § 1341(c)(2)(A); and for PBGC to determine that the requirements of § 1341(c)(2)(B) have been met. Section 1341(c)(2)(B) provides:

---

**2.** The financial Statement of Diversified Industries Retirement Income Plan for the period of 8/1/93 through 8/31/93 indicates the Plan con-

tained assets with a then-market value of approximately $6,000,000.00.

"(B) Determination of corporation [PBGC] of necessary distress criteria

Upon receipt of the notice of intent to terminate required under subsection (a)(2) of this section and the information required under subparagraph (A), the corporation [PBGC] shall determine whether the requirements of this subparagraph are met as provided in clause (i), (ii), or (iii). The requirements of this subparagraph are met if each person who is [as of the proposed termination date] a contributing sponsor of such plan or a member of such sponsor's controlled group meets the requirements of *any* of the following clauses:" (emphasis added)

Section 1341(c)(2)(B)(i) pertains to a person in a Chapter 7 liquidation in federal bankruptcy or state insolvency proceedings and, therefore, is not applicable to the instant case. Subparagraph (B)(ii) deals with a person seeking reorganization under Chapter 11 of Title 11 or any similar state law. The requirements under subparagraph (B)(ii) are met if the Debtor submits to PBGC any request for the approval of the bankruptcy court and the bankruptcy court determines that, unless the plan is terminated, the Debtor ". . . will be unable to pay all its debts pursuant to a plan of reorganization and will be unable to continue in business outside the chapter 11 reorganization process and approves the termination." Subparagraph (B)(iii) deals with the terminations required to enable plan sponsors to pay their debts while staying in business or to avoid unreasonably burdensome pension costs caused by a declining work force. Subparagraph (B)(iii)'s criteria are met when the debtor demonstrates to the satisfaction of the PBGC that:

"(I) unless a distress termination occurs, such person will be unable to pay such person's debts when due and will be unable to continue business, or . . ."

■ The first issue deals with the Debtor's assertion that pursuant to § 1341(c)(2)(B) it has a right to proceed under either subparagraphs (B)(ii) or (iii) and it has elected to proceed with the initiation of the termination based on the requirements of § 1341(c)(2)(B)(iii). The Debtor relies on the fact that § 1341(c)(2)(B) uses the word "any" when it states that the requirements of subparagraph (B) are met when ". . . a contributing sponsor of such plan or a member of such sponsor's controlled group meets the requirements of any of the . . ." following subparagraphs (B)(i), (ii) or (iii). The Court agrees with the Debtor. If Congress wished to limit a Chapter 11 debtor to subparagraph (B)(ii), it could have drafted the statute to clearly indicate such a restriction. In the instant case the language is unambiguous and the use of the word "any" clearly gives the Debtor the option to proceed under either subparagraphs (B)(ii) or (iii). Obviously, the Debtor could not proceed under (B)(i) because that paragraph is specifically limited to Chapter 7 cases.

■ In order to submit the request to terminate the Diversified Plan to the PBGC the Debtor must satisfy the "business judgment" test and show that the decision is a reasonable exercise of its business judgment. The Debtor does not have to establish separately before this Court that all of the elements for a distress termination have been met.

■ Mr. Fixman further argues that even if the Debtor had the choice to elect between (B)(ii) or (iii), it exercised that choice when it filed Debtor's Motion For Authorization To Terminate Diversified Industries, Inc. Retirement Income Plan, since that motion utilizes the language found in (B)(ii) and not in (B)(iii). It is true that the Debtor's motion is inartfully drafted and fails to clearly set forth which subparagraph it wishes to pursue. It is also true that the language in paragraph five of said motion resembles the language of (B)(ii)(IV). However, such factors do not preclude the Debtor from proceeding under (B)(iii). In its briefs and court presentations the Debtor clearly indicated that it wishes to proceed under (B)(iii) and has not inadvertently elected to submit to (B)(ii). If necessary the Court will grant the Debtor leave to amend its Motion to clarify any ambiguity.

The Debtor also offered a very pragmatic argument as to why this Court should not proceed under (B)(ii). Since this Court does not have jurisdiction over United, only PBGC

can determine whether United's Plans should be terminated. If the Debtor were to proceed before this Court pursuant to (B)(ii), in its effort to terminate Mr. Fixman's pension, the possibility would exist that PBGC and this Court would reach different conclusions as to whether or not the Debtor's and United's Plans should be terminated. If opposite conclusions were reached, a reorganization of the Debtor would be far more difficult, if not impossible, to achieve. The Court agrees with the Debtor that it is preferable for one entity to determine whether the Plans should be terminated and because this Court does not have jurisdiction over both the Debtor and United, PBGC should exercise its jurisdiction over both parties.

 Initially Mr. Fixman argued that to allow the Debtor to proceed under (B)(iii) would subject him to an unjust and unfair review by the PBGC, because it had an economic interest in the ultimate outcome of this case and, therefore, was not an impartial tribunal. This conclusion was based on the fact that under the Debtor's Original Plan of Reorganization PBGC, Debtor's largest creditor, would receive 40% of the ownership of the reorganized company. Subsequent to the hearing, the PBGC has demanded a cash settlement of its claims and is not interested in an ownership position in the reorganized company. Mr. Fixman has failed to present any evidence that would substantiate his assertion that PBGC can not impartially discharge its duty. The mere fact that PBGC is the largest creditor is not persuasive.

Accordingly, Debtor's Motion 270 is sustained and an Order consistent with this Memorandum Opinion will be entered this date.

### ORDER AUTHORIZING THE DEBTOR TO FILE NOTICE OF INTENT TO TERMINATE PLAN WITH THE PENSION BENEFIT GUARANTY CORPORATION

The Debtor, Diversified Industries, Inc. filed a Motion seeking this Court's authorization to file a notice of intent to terminate the Diversified Industries, Inc. Retirement Income Plan (the "Plan") with the Pension Benefit Guaranty Co. Corporation (PBGC).

One of the participants in the Plan, Ben Fixman, filed an objection to the Debtor's motion alleging in part that the Debtor was required under the Employee Retirement Income Security Act (ERISA) to have this Court determine whether the Plan could be terminated. A hearing was held on the Debtor's Motion, briefs were submitted, testimony was taken and arguments of counsel were considered.

Accordingly, for the reasons set forth in the Memorandum Opinion filed this date, it is ORDERED that the Debtor may submit the appropriate notices under ERISA to the PBGC to institute the proceedings at that agency to terminate the Plan.